NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSSION,<br><br>Plaintiff,<br><br>v.<br><br>CLAY CAPITAL MANAGEMENT, LLC, JAMES F. TURNER II, SCOTT A. VOLLMAR, SCOTT A. ROBARGE, AND MARK A. DURBIN,<br><br>Defendants. | Hon. Dennis M. Cavanaugh<br><br>**OPINION**<br><br>Civil Action No. 2:11-cv-05020-DMC-JBC |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon Plaintiff U.S. Securities and Exchange Commission's ("Commission" or "SEC" or "Plaintiff") Motion for Summary Judgment against Defendant Scott A. Vollmar ("Vollmar" or "Defendant"). (Pl.'s Mot. for Summ. J., Mar. 27, 2013, ECF No. 41). Pursuant to Fed. R. Civ. P 78, no oral argument was heard. Based on the following and for the reasons expressed herein, Plaintiff's Motion for Summary Judgment is **granted**.

I. **BACKGROUND**[1]

Vollmar was employed by Autodesk, a California company, as director of business development. In this position, Vollmar was privy to confidential information about Autodesk's financial results, business plans, and potential sales and mergers. Vollmar understood that he

---

[1] The facts set forth in this Opinion are taken from the parties' respective pleadings and moving papers.

1

had a duty to Autodesk to keep such information confidential. Vollmar had a close relationship with James F. Turner ("Turner"). Vollmar and Turner were friends, business school classmates and brothers-in-law. Turner was the Chief Investment Officer of a hedge fund, the Clay Capital Fund, LP ("Clay Fund"), and was responsible for directing the Clay Fund's trading.

In January 2008, Vollmar disclosed confidential information to Turner about Autodesk's interest in potentially acquiring Moldflow. Specifically, between January 2008 and May 1, 2008, Vollmar updated Turner on the status of the negotiations between Autodesk and Moldflow. During this time, Turner purchased more than $2.3 million worth of Moldflow stock for the Clay Fund. Turner also purchased Moldflow stock in eleven separate brokerage accounts that he controlled, including his own accounts and accounts in the names of his children, his wife, his parents, and his sister. As a result of Autodesk acquiring Moldflow on May 1, 2008, Moldflow's stock increased by 11 percent over the previous day's closing price, which yielded Turner greater than $1.89 million in trading profits.

Vollmar also disclosed confidential information to Turner about Autodesk's anticipated financial results for the fourth quarter ending January 31, 2008, and indicated to Turner that Autodesk would likely exceed its earnings targets for the quarter. Later, however, Vollmar received confidential information indicating that Autodesk's outlook had changed, which Vollmer disclosed to Turner. Specifically, Vollmar learned that it would be difficult for Autodesk to meet its fourth quarter targets. Based on this confidential information, Turner directed the Clay Fund to sell short 20,000 shares of Autodesk stock and to purchase 600 put option contracts on Autodesk stock. Turner also purchased 1,700 Autodesk put options in five separate brokerage accounts that he controlled. This illicit Autodesk trading generated profits in excess of $836,000 for Turner.

After the Commission sued Vollmar and Turner for insider trading, both were charged criminally for the same misconduct and both pled guilty before this Court. At his plea allocution, Vollmar admitted that he tipped Turner about Moldflow and Autodesk, and that Vollmar did so knowingly, willfully and intentionally. The Court sentenced Turner to 12 months in prison and fined him $25,000. The Court sentenced Vollmar to two years' probation and fined him $15,000.

The Commission filed this action against Vollmar and three other individuals for perpetrating an insider trading scheme that generated illicit profits of nearly $3.9 million. The Commission has settled with each of Vollmar's codefendants, but settlement discussions between the Commission and Vollmar have been unsuccessful. For this reason, the Commission moves for summary judgment against Vollmar based on the preclusive effect of his criminal conviction and the undisputed evidence of Vollmar's unlawful tipping of material nonpublic information about Autodesk and Moldflow. Given that Vollmar admitted to the illegal tipping in his plea allocution, the Commission asserts that Vollmar can offer no disputed issue of material fact to defeat summary judgment. The Commission seeks an order permanently enjoining Vollmar from future violations of the laws at issue in this case; ordering Vollmar to disgorge $627,574 of the illicit trading profits plus prejudgment interest of $124,984; and imposing a civil penalty of $8,182,722, the maximum civil penalty allowed under the securities laws.

## II. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett,

3

477 U.S. 317, 330 (1986); FED. R. CIV. P. 56(c). The moving party bears the burden of showing that there is no genuine issue of fact. Id. "The burden has two distinct components: an initial burden of production, which shifts to the non-moving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." Id. The non-moving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, but must produce sufficient evidence to support a jury verdict in his favor. Id. at 322; see also FED. R. CIV. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "In determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences - including issues of credibility - in favor of the non-moving party." Newsome v. Admin. Office of the Courts of the State of N.J., 103 F. Supp.2d 807, 815 (D.N.J. 2000), aff'd, 51 Fed. App'x 76 (3d Cir. 2002) (citing Watts v. Univ. of Del., 622 F.2d 47, 50 (D.N.J. 1980)).

**III.     The Federal Securities Laws Prohibit the Tipping of Material Nonpublic Information**

Section 17(a) of the Securities Act prohibits fraud in the offer or sale of a security. 15 U.S.C. § 77q(a). Insider trading, which constitutes the unlawful trading in securities based on material non-public information, is well established as a violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5. See Dirks v. SEC, 463 U.S. 646, 653-54 (1983); Chiarella v. United States, 445 U.S. 222, 226-30 (1980). The United States Supreme Court's insider trading jurisprudence is not limited to insiders or misappropriators who trade for their own account. Section 10(b) and Rule 10b-5 also apply to situations in which the insider or misappropriator tips another who trades on the information. In Dirks, the United States Supreme Court held that a tipper violates Section 10(b) by disclosing material nonpublic information to his tippee, in breach of his duty to keep the information confidential. 463 U.S. at 662–63. In

4

determining the scope of tipper-tippee liability under Section 10(b), the Supreme Court expressed that "the test is whether the insider personally will benefit, *directly or indirectly*, from his disclosure." Id. at 662. (emphasis added). In regards to the insider's "personal benefits," the Supreme Court ruled that, as with someone in Vollmar's position, "elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend." Id. at 664.

Similarly, Section 14(e) of the Exchange Act and Rule 14e-3 thereunder proscribes fraud in connection with a tender offer. See 15 U.S.C. § 78n(e); 17 C.F.R. § 240.14e-3(a). Rule 14e-3 prohibits trades based on material nonpublic information concerning a tender offer that a person knows or has reason to know has been acquired from an insider, either directly or indirectly. United States v. O'Hagan, 521 U.S. 642, 669 (1997) (quoting United States v. Chestman, 947 F.2d 551, 557 (2d Cir. 1991)). In the case of tippers, these provisions make it unlawful for an insider "to communicate material, nonpublic information relating to a tender offer to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result" in illicit insider trading. See SEC v. Drescher, No. 99-1418, 1999 U.S. Dist. LEXIS 16033, at *13-15 (S.D.N.Y. Oct 19, 1999) (allegations that tipper and tippees were close friends plus allegations concerning statements about acquiring company and targets determined to be sufficient circumstantial evidence to show that tipper was reckless in disclosing nonpublic information and reckless disregard of the fact that tippees were likely to trade based on the information).

Although Vollmar argues that he should not be found liable for insider trading because he did not receive any personal benefit for tipping Turner, (Def.'s Br. 10-15), the relationship between Vollmar and Turner is precisely the type of close, familial, and personal relationship

5

that courts hold as demonstrating a personal benefit to the tipper. See SEC v. Warde, 151 F.3d 42, 49 (2d Cir. 1998) ("The close friendship between [the tipper and tippee] suggests that [the tipper's] tip was 'intended to benefit' [the tippee], and therefore allows a jury finding that [the tipper's] tip breached a duty under § 10(b)."); SEC v. Blackwell, 291 F. Supp. 2d 673, 692 (S.D. Ohio 2003) ("[The tipper] obviously could have intended to give a gift to his family members…"). It is undisputed that Vollmar and Turner attended business school together, are brothers-in-law, and that Vollmar was the best man in Turner's wedding. Contrary to Vollmar's attempt to downplay his relationship with Turner, there is evidence showing that Vollmar and Turner placed more than fifty telephone calls to one another during the time period in which Vollmar made the illicit tips. Thus, the Court finds that no material issue of fact exists as to whether Vollmar received a personal benefit from tipping Turner.

### A. Collateral Estoppel – Vollmar's Guilty Plea Prevents Him from Contesting His Liability for Insider Trading

The doctrine of collateral estoppel bars a party from relitigating issues that were actually litigated and necessary to the outcome of a first action in subsequent suits arising from different causes of action. See Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 326 n.5 (1979). The Third Circuit has held that a party is precluded from relitigating a legal or factual issue when: "(1) the issue . . . is the same as that involved in the prior action; (2) the issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment." SEC v. Lazare Indus., 294 Fed. Appx. 711, 714 (3d Cir. 2008) (quoting Peloro v. United States, 488 F.3d 163, 174-75 (3d Cir. 2007)). In the context of a criminal conviction, the Third Circuit also ruled that the "preclusive effect [of a criminal conviction] extends to all issues that are necessarily admitted in the plea." Anderson v. Comm'r, 698 F.3d 160, 164 (3d Cir. 2012).

In an attempt to establish that a disputed issue of material facts exists, Vollmar argues that he: (1) did not actively participate in an insider trading conspiracy; (2) was not privy to confidential and material inside information; (3) did not expect that Turner would trade on Vollmar's tips; and (4) never discussed with Turner a false cover story to be given to the authorities. (Def.'s Br. 6-10). These assertions by Vollmar, however, contradict his own sworn admissions at his plea hearing. (Pl.'s Reply Br. 1-3).

At Vollmar's plea hearing, he made the following specific and inculpatory admissions: (1) Vollmar admitted that he knowingly and willfully conspired with Turner to engage in securities fraud (Pl.'s Ex. A at 21:7-12); (2) Vollmar admitted that he was privy to material, non-public information as an Autodesk employee concerning Autodesk's financial results, business plans, and potential acquisitions and mergers (Id. at 22:23-23:3); (3) Vollmar admitted that he violated his duty of confidentiality to Autodesk by disclosing material non-public information about Autodesk and Moldflow to Turner (Id. at 23:22-24:3, 24:9-13, 25:12-16); (4) Vollmar admitted that he understood that it was likely that Turner would use the information to make securities trades at the time he disclosed the information about Autodesk and Moldflow (Id. at 24:4-8, 25:17-22); (5) Vollmar admitted that after being contacted by the Commission, he and Turner discussed a fake "cover story" to give to the authorities in the event they were contacted about Turner's Moldflow purchases (Id. at 24:14-19); and (6) Vollmar admitted that he acted knowingly, willfully, and intentionally (Id. at 26:20-23).

Having unambiguously admitted to each of these facts at his plea hearing, Vollmar cannot create an issue of material fact by now disputing the veracity of his prior admissions. See Gonzalez v. Sec'y of Dept. of Homeland Sec., 678 F.3d 254, 263 (3d Cir. 2012) (conclusory, self-serving statements cannot create an issue of fact to defeat a summary judgment, when the

statements are "impeached by a well supported showing to the contrary") (citations omitted). Because Vollmar admitted to each of the requisite elements of insider trading in his guilty plea, he is now precluded from re-litigating those issues in this civil matter. Anderson, 698 F.3d at 164. Thus, Vollmar's belated attempts to take back his sworn admissions from his plea hearing do not entitle him to a trial in this case. As Vollmar admitted to each of the elements of insider trading at his plea hearing, the Court finds that no genuine issue of material fact exists and that summary judgment in favor of the Commission is appropriate. See SEC v. Obus, 693 F.3d 276, 286 (2d Cir. 2012) ("To be held liable, a tipper must (1) tip (2) material non-public information (3) in breach of a fiduciary duty of confidentiality owed to . . . the source of the information; (4) for personal benefit to the tipper.").

### B. Permanent Injunction Analysis

The Commission requests that this Court grant a permanent injunction prohibiting "Vollmar from committing future violations of Section 17(a) of the Securities Act, Section 10(b) and 14(e) of the Exchange Act, and Rules 10b-5 and 14e-3 thereunder." (Pl.'s Br. 9). The Commission is authorized to seek a permanent injunction whenever it appears that a person "is engaged or is about to engage in acts or practices constituting a violation" of the federal securities laws. See 15 U.S.C. § 78u(d)(1). The purpose of injunctive relief is to protect the investing public and deter future infractions of the securities law. SEC v. Bonastia, 614 F.2d 908, 912 (3d Cir. 1980). In determining whether injunctive relief is warranted, the Third Circuit has articulated five factors: (1) the degree of scienter involved; (2) the isolated or repeated nature of the violations; (3) the defendant's recognition of the wrongful nature of the conduct; (4) the sincerity of the defendant's assurances, if any, against future violations; and (5) the likelihood that the defendant's occupation will present opportunities for future violations. See SEC v. Teo,

8

No. 04-01815, 2011 U.S. Dist. LEXIS 103413, at *23-27 (D.N.J. Sept. 12, 2011) (citing Bonastia, 614 F.2d at 912). In applying these five factors, no one factor is determinative, but rather, the totality of the circumstances should be considered in reaching a decision. Id.

Based on an analysis of the relevant factors, the Court finds that Vollmar should be enjoined from future violation of the federal securities laws. The evidence shows that Vollmar acted with a high degree of scienter given that he admitted to knowingly, willfully, and intentionally tipping Turner on numerous occasions. Although Vollmar was a tipper and did not trade himself, courts have found that "the tipper's conduct, almost invariably, is more culpable than that of the tippee." See Blackwell, 477 F. Supp. 2d at 911 (finding "[t]he fact that [the tipper] did not personally trade on inside information does not make his conduct less egregious.").

In addition, Vollmar's attempts to take back his sworn admissions in response to the Commission's Motion for Summary Judgment do not demonstrate a recognition of the wrongfulness of his conduct. Furthermore, given Vollmar's M.B.A. and work experience as a corporate executive, it is possible that he will return to the business world where he will have the opportunity to commit future violations. The fact that Vollmar has been criminally convicted for his conduct and is not currently working as a corporate executive in the securities industry fails to establish a sufficient basis to preclude the issuance of an injunction. See Bonasita, 614 F.2d at 913 (finding that no longer working in the securities industry is insufficient by itself to preclude the issuance of an injunction); Teo, 2011 U.S. Dist. LEXIS 103413, at *23-27 (issuing an injunction even though defendant has already pled guilty to insider trading); Blackwell, 477 F. Supp. 2d at 911 (granting an injunction following insider trading conviction, and finding that "[o]n several previous occasions, courts have awarded injunctive relief to the SEC after it has

used collateral estoppel based on criminal convictions."). Accordingly, the Court finds that injunctive relief is appropriate under these circumstances.

## C. Disgorgement Analysis

Section 27 of the Exchange Act, 15 U.S.C. § 78a, "confer[s] general equity powers upon the district courts to fashion remedies for securities laws violations." In re Bayou Group, LLC, 564 F.3d 541, 548 (2d Cir. 2009); see also SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1103 (2d Cir. 1972) ("Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy."). "Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating securities laws." SEC v. Hughes Capital Corp., 124 F.3d 449, 455 (3d Cir. 1997) (quoting SEC v. First City Fin. Corp., 281 U.S. App. D.C. 410, 890 F.2d 1215, 1230 (D.C. Cir. 1989). Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, as shown here, the court possesses the necessary power to fashion an appropriate remedy," including an order requiring the defendant "to disgorge the profits that he obtained by fraud." Manor Nursing Centers, Inc., 458 F.2d at 1103; SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978). "The SEC need not 'trace every dollar of proceeds misappropriated by the defendants' but must present a reasonable approximation of the illicit profits." SEC v. Chester Holdings, Ltd., 41 F.Supp. 2d at 528 (quoting SEC v. Hughes Capital Corp., 917 F. Supp. 1080, 1085 (D.N.J. 1996), aff'd, 124 F.3d 449 (3d Cir. 1997)). The proper measure of the amount of disgorgement is the difference between the price at which the inside trader sold the stock and the price of the stock shortly after the disclosure of the inside information. SEC v. Patel, 61 F.3d 137, 139-40 (2d Cir. 1995).

In the context of a tipper-tippee relationship, "[a] tippee's gains are attributable to the tipper, regardless of whether or not a benefit accrues to the tipper." SEC v. Warde, 151 F.3d 42, 49 (2d Cir. 1998); see also SEC v. Teo, No. 04-01815, at *21 (D.N.J. Sept. 12, 2011) ("[W]here two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws, they have been held jointly and severally liable for the disgorgement of illegally obtained funds"); Hughes, 124 F.3d at 455 ("When apportioning liability among multiple tortfeasors, it is appropriate to hold all tortfeasors jointly and severally liable for the full amount of the damage…"). In this case, the SEC determined that the total profits Turner earned for himself, his family, and Clay Capital was $2,727,574. It is undisputed that Turner and Clay Capital have already paid a total of $2,100,000 in disgorgement in this matter. Thus, the total amount of illegal profits that remains unpaid is $627,574.

The Court finds disgorgement is warranted here and that Vollmar is jointly and severally liable for the illicitly earned profits. Although Vollmar claims that he did not profit in any way from the illicit insider trading activity, supporting case law recognizes that a tipper may be held liable for the profits of his tippee. See Warde, 151 F.3d at 49 (citing SEC v. Clark, 915 F.2d 439, 454 (9th Cir. 1990)) ("The value of the rule in preventing misuse of insider information would be virtually nullified if those in possession of such information, although prohibited from trading for their own accounts, were free to use the inside information on trades to benefit their families, friends, and business associates."). Because Vollmar bears the burden of resolving the risk of uncertainty in calculating disgorgement, and because Vollmar fails to offer any credible evidence to the contrary, the Commission's sum of $627,574 is a reasonable approximation of the remaining unpaid profits that Turner traded using the inside information provided by Vollmar. As such the Court orders Vollmar to pay $627,574 in disgorgement.

## D. Prejudgment Interest

A district court has the discretion to order payment of prejudgment interest upon a consideration of both compensation and fairness. SEC v. Antar, 44 F. App'x 548, 552 (3d Cir. 2002) (citation omitted). The Third Circuit has held that "prejudgment interest may be denied when its exaction would be inequitable." Id. The purpose of prejudgment interest is to prevent a defendant from "obtaining the benefit of what amounts to an interest free loan" on the proceeds of an illegal activity while also "compensat[ing] an aggrieved party for the wrongful deprivation of its money." SEC v. Hughes Capital Corp, 917 F. Supp. 1080, 1085 (D.N.J. 1996), aff'd, 124 F.3d 449 (3d Cir. 1997)) (citation omitted). The calculation of prejudgment interest follows the delinquent tax rate for unpaid taxes as determined by the Internal Revenue Service, and is assessed on a quarterly basis. SEC v. Chester Holdings, Ltd., 41 F. Supp. 2d 505, 529 (D.N.J. 1999). Although the Third Circuit has not enumerated a list of factors that district courts should consider when determining whether prejudgment interest is warranted, other Circuit Court of Appeals have considered: "(i) the need to fully compensate the wronged party for actual damages suffered; (ii) considerations of fairness and the relative equities of the award; (iii) the remedial purpose of the statute involved; and/or (iv) such other general principles as are deemed relevant by the court." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1476 (2d Cir. 1996).

In this case, the balance of equities weigh in Vollmar's favor and thus warrants against awarding prejudgment interest. Even though Vollmar, who was an insider and privy to confidential information at Autodesk, divulged inside information to Turner, Vollmar did not himself execute any trades based on the information. The Commission has also failed to provide any evidence demonstrating that Vollmar directly profited from tipping inside information to Turner or that he had access to Turner's illicit profits at any time. Moreover, the Commission

cannot point to any aggrieved party that was wrongfully deprived of an economic benefit as a result of the insider trading scheme between Turner and Vollmar. As such, the Court finds an award of prejudgment interest in this case is unwarranted. See SEC v. Rubin, No. 91-6531 1993 U.S. Dist. LEXIS 13301, at *16 (S.D.N.Y. Oct. 8, 1993) (declining to impose prejudgment interest on tipper who did not trade or profit from trading on inside information because such interest would constitute an unjust penalty). Accordingly, the Court denies the Commissions' request to order Vollmar to pay prejudgment interest of $124,984 on the disgorgement award.

### E. Civil Monetary Penalty

Section 21A of the Exchange Act authorizes the court to assess a civil monetary penalty on a person who has engaged in insider trading. 15 U.S.C. § 78u-1. The amount of the penalty "shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result of" the insider-trading activity. See 15 U.S.C. § 78u-1(a)(2). The civil penalty is intended to serve as a deterrent mechanism, because disgorgement of profits alone "merely restores a defendant to his original position without extracting a real penalty for his illegal behavior." H.R. Rep. No. 98-355, 98th Cong., 2d Sess., 7-8 (1984), reprinted in 1984 U.S.C.A.A.N. 2274, 2280-81. In determining the amount of a civil penalty, courts look to a numbers of factors, including: "(1) the egregiousness of the defendant's violations; (2) the isolated or recurrent nature of the violations; (3) the degree of scienter; (4) the amount of illegal profits; and (5) the deterrent effect of the penalty in light of defendant's net worth." SEC v. Johnson, No. 02-5490, 2004 U.S. Dist. LEXIS 30875, at *14 (D.N.J. Aug. 27, 2004).

The Commission contends that Vollmar's actions warrant the Court to impose a maximum penalty of $8,182,722. (Pl.'s Br. 13). According to the Commission, the maximum

13

penalty is appropriate in this case because Vollmar admitted during his plea hearing that "he acted deliberately in repeatedly tipping Turner with confidential information that Vollmar was entrusted to protect." Id. Thus, the Commission argues that "Vollmar's violations were egregious, recurring and . . . intentional." Id. Vollmar argues that the nature of his illicit conduct was isolated because there were only two incidents during his fourteen years of employment with Autodesk that he misappropriated material nonpublic information. (Def.'s Br. 22). Vollmar also argues that he did not reap any profit from tipping inside information to Turner. Id. at 22-23. Moreover, as a consequence for his illicit actions, Vollmar has lost his job; has been unable to secure other employment; and was forced to sell his home for a $150,000 loss to avoid foreclosure. Id. at 11-12. Vollmar also argues that his current net worth demonstrates his inability to pay a meaningful penalty award. (Id. at 22-23).

The Court finds that a civil monetary penalty is not appropriate in this case. First, Vollmar's modest financial worth weighs against the assessment of a substantial civil penalty. As an initial matter, courts recognize that a defendant's net worth is a critical factor in determining the amount of civil penalty to award. See SEC v. Pardue, 367 F. Supp. 2d 773, 777 (E.D. Pa. 2005) (rejecting the Commission's argument that a defendant's "impecuniousness should have no effect on the Court's determination" of what civil penalty to assess on the grounds that ignoring a defendant's present financial condition would entail "doing considerable misjustice"); see also SEC v. Gunn, No. 08-1013, 2010 U.S. Dist. LEXIS 88164, at *44 (N.D. Texas Aug. 25, 2010) ("The defendant's net worth and corresponding ability to pay has proven to be one of the most important factors that district courts consider when determining how much of a civil penalty to assess in an insider-trading case.").

The Court also finds that awarding a substantial civil monetary penalty is not appropriate because Vollmar's violations of the federal securities laws were isolated. Compare, e.g., SEC v. Opulentica, 479 F. Supp. 2d 319, 329 (S.D.N.Y. 2007) (finding that a violation was not "a single, isolated incident" where the violation arose out of "a continuing course of wrongful conduct of more than eighteen months"), with United States SEC v. Snyder, No. 03-4658, 2006 U.S. Dist. LEXIS 81830, at *11-12 (S.D. Tex. Aug. 22, 2006) (characterizing as isolated the conduct of a defendant who committed four separate violations of the federal securities laws over a period of a few months); SEC v. Ingoldsby, No. 88-1001, 1990 U.S. Dist. LEXIS 11383, at *5-6 (D. Mass. 1990) (declining to issue an injunction where the defendant's "infraction of the securities law was an isolated event, and the SEC has presented no evidence of either prior or subsequent violations by the defendant."). Vollmar's tipping can be characterized as two incidents over less than a five month period. Furthermore, this is the first time that Vollmar has been found liable for violating the securities laws. Thus, the Court finds that Vollmar's conduct was isolated.

The Court concludes that a civil penalty is inappropriate in this case. The Court finds that Vollmar's criminal penalties in conjunction with the injunctive relief and disgorgement of profits ordered in this Opinion will serve as a sufficient deterrent against any future violations of securities laws. In making this determination, the Court has also considered (1) Vollmar's precarious financial condition; (2) the lack of evidence showing any personal economic benefit; and (3) the fact that this is Vollmar's first violation of the securities laws and appears to be an isolated incident. Accordingly, in light of the facts and circumstances of this case and based on its consideration of the factors enumerated above, the Court denies the Commission's request to impose a civil penalty against Vollmar.

**I.     IV. CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is **granted.** The Court enters a permanent injunction against Vollmar prohibiting him from committing future violations of Section 17(a) of the Securities Act, Section 10(b) and 14(e) of the Exchange Act, and Rules 10b-5 and 14e-3 thereunder. The Court finds that Vollmar is liable to the Commission for disgorgement in the amount of $627,574. The Commission's request for prejudgment interest and a civil penalty is **denied.** An appropriate Order accompanies this Opinion.

_____
Dennis M. Cavanaugh, U.S.D.J.

Date:       November 6, 2013
Original:   Clerk's Office
cc:         Hon. James B. Clark, U.S.M.J.
            All Counsel of Record
            File